We'll begin our morning with Jackson v. Carin and Mr. Norman. This is a big, cavernous room, so I'm going to ask people to speak up. Certainly, Your Honor. Good morning. May it please the Court. My name is Stephen Norman, and I am here on behalf of Appellant Angelo Jackson. The Court in this case erred in two ways. The first was they failed to determine the evidentiary value of their surveillance video for purposes of both the materiality test and also for qualified immunity, focusing instead on the appellee's subjective viewpoint instead of on an objective standard, which is required under both Robinson and the New Mexico Court Case Rex. And secondly, they failed to properly administer the materiality test from Miller, Franks, leaving some falsities in the affidavit and failing, including lots of omissions that should have been included. I'm going to focus on the second part first. Like a lot of the cases that were cited, this is not a case of eyewitness identification or a victim identification, and I direct the Court to Joint Appendix 580 so you can see just how big a difference the one person that was convicted compared to Mr. Jackson. I mean, they don't look at all alike. Different skin tone, different eyes, different facial structure. Your argument is that the magistrate judge was misled by Mr. Caron in his warrant application? Your Honor, yes. I think when you take the false statements, which include the fact that Caron included there was a match, which is a conclusive determination that the surveillance video and Mr. Jackson look alike. One identification from Heysen, which really wasn't an identification. Even the District Court found that for purpose of argument. We're not going to include that. And Heysen testified that he did not positively identify Jackson. It just says the photograph matched the subject depicted in the video. It did say that, Your Honor. And Caron has walked away from that. It is an undisputed fact that he says, hey, I didn't make that determination. I relied solely upon Officer Heysen and Officer Lozano, who are both listed as officers and not listed by name here. And the problem is that when you say it's a match, obviously that's a conclusion that it looks exactly like Mr. Jackson. Didn't Lozano say that? No, Caron wrote that in the affidavit. I understand, but he's entitled to rely on his fellow police officers. And my question was to you, didn't Lozano say it was a match? Lozano, we don't know, because Caron never spoke to Lozano before he drafted the affidavit. The evidence in the record suggests that Lozano recognized Jackson immediately when he saw it. Isn't that what it says? That was real, Your Honor. It does, but I didn't qualify that, because Caron never spoke to Lozano before drafting this affidavit. I don't understand why you're making a big deal of that. Officers talk with each other. This was a double murder. They're trying to pick somebody up quickly. And one of the three officers in the investigation said, I know that man, that's Jackson, and explained why he knew him and had several contacts with him. Now tell me, what's the problem with that when the officers rely on each other? Caron didn't see anybody. He didn't know Jackson. He didn't know the culprit in the picture. He was conducting an investigation, and basically he consults with his colleagues, and they have somebody that says, yes, I recognize him, immediately said that. So the question is, why isn't that a match? Your Honor, you can rely on your colleagues. Caron did not speak to Lozano. And the only thing Lozano saw was an unidentified snapshot. Well, let's go back to an issue that you didn't raise. My question is, can Caron rely on other officers' information in seeking a warrant? Yes, Your Honor, as long as it's reliable. As long as it's reliable. So we have any evidence that Lozano was unreliable at the time? Absolutely. Pardon me? Absolutely. A surveillance video itself is not reliable. Just a minute. Lozano said, according to what Caron understood, Lozano said, I recognize him as Jackson, didn't he? Tell me what he said. He did. Okay. But he didn't say that to Caron. It was passed on secondhand. Through officers during the investigation. But he's not an eyewitness. All he did was see an unidentified snippet from an unreliable surveillance video. Look, an officer calls from New York and says, there's a guy coming down on I-95 driving this kind of car, and there's this kind of guy, and there's two people in the car, and this is a license plate number. Yes. An officer in Delaware didn't see any of that. He just relies on the officer, and he picks up the car. He can do that. No, no. Your Honor, that's totally different. I said, can he do that? No, he can. But that's an eyewitness. This is someone who's seeing an officer. The officer didn't see. The officer is told who it is to pick up. The officer doesn't know anything about what was done, whether there was a bank robbery, a theft, or whatever it was. They just say, pick him up. Now, the officer in Delaware is only relying on the information provided by the officer in New York. And you say that's improper. No, I'm not saying that's improper. I'm saying that in this particular case, Officer Karen was aware of the unreliability of the surveillance video. It wasn't of good quality. It was fuzzy. And he was aware that only one snapshot from this unreliable evidence. But that doesn't mean that he misled the magistrate in some way. I think one of the things that is important to me is that this man is investigating a double homicide. And he doesn't have all the time in the world. I mean, if you have more time, you would investigate the alibi and all of this. But he didn't have time here because two people had been killed in a shopping center. And there was a danger, I think, that this individual could go on a shooting spree and kill others. And then think how the officer would have felt under those circumstances. So he did, to his credit, he didn't just arrest Mr. Jackson on the spot. He actually sought a warrant. And before seeking the warrant, he checked with his supervisor and said, does this suffice? And his supervisor said, yes. But he's still, I mean, somebody you can arrest on probable cause. But he didn't do that. He went and got the warrant. And that's the kind of thing you would want an officer to do, which is to seek out a warrant, not to evade it. Not to evade the warrant process. And check with a supervisor before doing so. And then when time allowed, he chased down exculpatory evidence and was able to find witnesses who verified the alibi. And once he came in possession of that, he actually moved, as indeed he should have, for Mr. Jackson's release. Yes, Your Honor. And so it seems hard. Your Honor, the issue is that if you arrest... It seems a bit tough to string up somebody like that if you had time to check out this and that. But we don't, our case law doesn't say that you have to run down every possible lead or come up with every possible piece of evidence and everything. Under the time emergency that this man was working under, he did the best he could with what he had. Well, Your Honor, arresting the wrong person doesn't make anybody safer. It endangers the public more so because you have a false sense of security that the right person has been arrested. It doesn't allow you to cut corners and not determine probable cause here. Let me ask you a question. So you would agree, and I think you said this earlier, that the district court said that there was an issue with him relying upon hyacinth. I'm looking at the actual affidavit that he presented to the magistrate. Yes, Your Honor. And he said that the suspect was identified by Montgomery County police officers who have had prior law enforcement contacts with the suspect. What, hyacinth, he carves him out because he said this is problematic, there's some misstatement here is what the district court finds, right? Yes, Your Honor. Okay, so then we look to Lozano. Yes, Your Honor. And I'm just looking at what's in the affidavit, and I'm referring to JA 242. He said that Lozano had prior law enforcement contacts with Jackson. Yes, Your Honor. What contacts did he have with Jackson? He never arrested him. He saw him at one state fair, and he had seen him online. He really didn't know him more than those passing encounters. There was no arrest, there was no, you know, it was just he knew who he was, basically. Okay, because he was on the gang unit, I believe is what he. He was, but he had never been arrested as part of that. He just knew that he affiliated with the gang unit. But I guess other than passing him at the fair, he never had any physical contact with him. No, Your Honor. Never arrested him, never anything. The problem with Lozano's identification is that, the problem with what Karen relied on is Karen knew that the surveillance video, the whole totality of the surveillance video wasn't good enough to identify somebody. And he was aware that Lozano only got one tiny snapshot. He didn't even know what the snapshot was. Just some officer who he doesn't know sent out something to the gang unit. And Lozano told another officer, hey, that's Angelo Jackson. But that snippet, if you look at it, that's at, let's see, that was at JA 580. It's foggy. It's cloudy. The perpetrator's eyes are closed. Karen should have known. You cannot rely upon that little snippet. Did Karen have any reason to doubt Lozano? Lozano's identification was pretty emphatic. It was pretty sure. And was there any reason for Karen to doubt that? Yes. He didn't know what that identification was based off of. All he had to do was pick up the phone. Officer Lozano, why do you think it's Angelo Jackson? And he never did that. I keep coming back to the fact that there's a double murder. There is. And this individual, Mr. Karen, is trying to head off the prospect of even more lives being taken. And there's all the difference in the world between someone acting under an extreme exigency and someone like as being staking out a house for over a period of two or three weeks. A lot of warrant affidavits are submitted when the officers had time to gather more evidence and all the rest. This officer did not have time. Yes, Your Honor. And all he had to do would have taken five minutes. Call Officer Lozano. Hey, you know, why do you think it's? And he didn't do that. There were many available witnesses. Never talked to one witness to see if they could identify Jackson. Never brought Mr. Jackson in just to say, hey, do you have an alibi? You know, didn't do anything. He should have known that that one snapshot. He doesn't even know what the snapshot looked like. He just knows that somebody sent a picture out and Officer Lozano identified Jackson on it. No idea what it looks like. Didn't talk to Lozano. Didn't do any follow-up. Just 100% relied upon that identification without doing any probing. Now, all the other cases here, the Miller case, all of them talk about an eyewitness identification, and all these officers did follow them. All of them went and interviewed the witness. All of them. We're not talking about absolute certainty here. We're talking about a probable cause standard. Your Honor, this was inherently unreliable to rely upon this. The Supreme Court has said that probable cause is a good bit less than beyond a reasonable doubt or anything like that. They've indicated it's not a high bar. I don't understand what reason Mr. Caron had to doubt Lozano. Your Honor, if I could make one more point before my time is up. If you look at the Robbins case. You will agree that Lozano's identification was a firm one. He did identify, apparently he did identify Mr. Jackson. You do agree that the identification was a firm one. Yes, but with the information Caron knew about the poor quality of surveillance video, he should have known that he could not be identified off of something that came from the surveillance video. All you have to do with the New Mexico case, Ricks, has a very similar situation where they basically said, can a jury make a determination that no officer can make this identification? And if they can, then it needs to go to the jury and it's not appropriate for summary judgment. And then the other case, Robinson, that this very court determined, basically said that you can't look at it from the subjective belief of Caron. Excuse me. Oh, I'm sorry, Your Honor, I didn't hear you. Judge, do you have any further questions? No, I don't. We have no further questions. Thank you. Thank you. You have some rebuttal time, though. Yes, I do. Thank you. Ms. Lloyd. Good morning. May it please the Court, Catherine Lloyd on behalf of the appellee, Michael Caron. The district court properly considered the undisputed facts in finding that the appellee had probable cause to seek a warrant for the dismissing all of the appellee's claims. Summary judgment was correctly granted by the district court on all counts because there is no material dispute of fact regarding supporting probable cause for the arrest warrant. And the appellee was entitled to judgment as a matter of law. So you think probable cause is someone looking at someone on pictures on social media and possibly walking by them at the fair and identifying them, that's probable cause? Well, I believe Detective Lozano was a detective with the criminal gang unit. His job in that role, his whole job, was to investigate gangs in the county and any crimes associated with gangs and gather intelligence about the gangs. Therefore, I think his identification of the appellant, who was a known gang member, was more reliable almost than an eyewitness. But you would agree he had no, the warrant says he had law enforcement, prior law enforcement contact. Usually, which is, I've arrested someone, I've interviewed them, I've, you would agree he had no contact with them. Other than looking online, so I can go on Instagram and say I have had contact with someone because I saw them on Instagram. Well, I think his whole job in investigating gangs is to follow them on social media and become familiar with the gang members and their associates. He did say he saw him at the fair and recognized him as the person that was posted as a member of the HITS gang and recognized him at the fair. He did say that. But did he have contact with him at the fair? He was able to recognize him at that time as someone that he had seen numerous times on social media. On social media, so we don't know. He doesn't know if that's who he saw on social media or not. Apparently he doesn't because he says I saw him at the fair. I mean, do you know that that's the same person that he saw since he misidentified him? Well, he was identified, Mr. Jackson, a known member of the HITS squad gang, and he saw him on flyers. He saw him on social media, and that was his. And so that's sufficient for probable cause, seeing somebody on social media and on a flyer. I think the fact that the detective was a trained law enforcement officer who's trained to observe and know all these gang members through social media. And he also had seen videos of Biapelli on social media. He was able to recognize him at the fair. And his identification, I specifically wrote down exactly what he said. On January 11th, he said at approximately 8.05 hours MCPD, Corporal Johnson sent out a still photograph of the suspect. I immediately recognized the suspect as being Angela Jackson, a previously validated gang member of the HITS squad gang. And the district court found that Detective Lorenzo was a member of a team dedicated to investigating the activity of local street gangs, one of which the appellant was a member, and that he emailed the appellee that he immediately recognized him. I don't think that you can then say that... You know, an interesting obverse test would be, let's assume that was a correct identification, and the officer Karen didn't get a warrant or didn't try to arrest him. He says, because it's not enough, I couldn't get him. What would the public say? Here you have Lozano that identifies him firmly and said, I've seen him in person. I've seen him held out as a member of that HITS squad gang, and I know that to be Angela Jackson. And Karen says, I'm not going to pay attention to you because I don't think you made a good judgment about looking at the picture and didn't arrest him, and it turned out he was the murderer. I mean, both of them would be fired. Right. And I think the court's points about this being an urgent situation for public safety are well founded. And they're also, these officers are working in good faith and under a strict timeline. You can't let somebody like that run around, number one, for safety, and number two, because you may not catch the person. The case can turn cold. And so they're doing their best efforts, and Karen's collecting this information, and he receives information from Lozano that Lozano knows this guy is Angela Jackson. And so Karen says, well, let me go and try to get a warrant. And he checked with his supervisor, and he was cautious, and the warrant was issued. Now, in that circumstance, it seems to me he should be entitled to rely on the warrant. Well, I would note also that he also consulted with the prosecutor. But he told them the same information he told the magistrate, that the two positively identified. He said positively identified. Two officers positively identified Mr. Jackson, and they didn't. That's a misstatement. That's misinformation. So the prosecutor relied on what he told them. The magistrate relied on what he told them. And he didn't even speak with Mr. Lozano. Well, I'd say that as the district court took out Heisen's identification as a question of fact. So we're just relying on Lozano. Yes, so the district court still found that with a gang member detective positively identifying from the photo, on several instances. Following that, on January 10th, Lozano said that he immediately knew the suspect as Angela Jackson. Angela Jackson is known to the CSGU as an associate of Hit Squad. He is known through numerous law enforcement contacts where he associates with a member of Hit Squad. And then he later recounted how he observed the appellate's photograph multiple times whenever his unit investigated the gang that the appellant associated with on social media. Right, but some of the social media was live video. And then at his deposition, when he was asked whether the appellant was the suspect, he said, to me at the time, I thought it was Mr. Jackson. I thought it was him. And it's apparent from all of that that the information that was relayed to the appellee of Detective Lozano's and not any kind of doubt on the part of Lozano. And I don't see any basis that Detective Karen wouldn't be relying on that information. I mean, the fact that he did not speak with or interview Detective Lozano prior to seeking a prosecutor's advice is not disputed, but it doesn't matter. Captain Jason Konkonos, in his deposition, he was the police rep. He said, in this case, if you have an incident that could possibly be gang-involved and a picture of a person that could possibly be gang-involved, and you have a gang-involved officer reviewing the photo, it's fairly probable that the person is that person that they were seeking. Officers are trained observers, and an officer's identification with Karen. You would agree that Lozano and Karen both testified that the video was not of good quality. Is that correct? Well, I would say that actually. He said it was fairly good. He did. Karen said that he thought it was fairly good. I thought Lozano said that the video was a little fuzzy. I'm trying to find the exact statement from Lozano. He did say that it was a little blurry, I think is the terms that he used. But I think it's important to note that at the time that the arrest warrant was issued, Karen didn't have any information. Nobody had told him anything, that anybody had any problem with the picture. Am I correct in recalling that Detective Lozano told Karen in an e-mail that he, quote, immediately recognized the suspect as being Angelo Jackson? That's correct. Pardon? That's correct, yes. So you have this e-mail, and he says he immediately recognized the suspect as being Angelo Jackson, but that's pretty strong. The e-mail doesn't indicate any hesitancy or whatever, and if he immediately recognized who it was, there would have to be some basis for that. There wasn't any uncertainty expressed in the e-mail. He was like, I'm sure. That's correct. There are two messages that Lozano had sent before the arrest warrant was sent out, and they both said that he had immediately recognized, and nothing made any mention that he felt that the photographs were blurry or hard to look at. One of the things that bear on the case, for me at least, was the enormity of the crime being committed, two individuals being shot in a shopping center. We have a lot of our localities are plagued with this kind of violence, and this is about as bad as it gets. And in addition to the enormity of the crime, you have time pressures of a more significant sort, and I guess how would we all feel if in hesitation and in hesitancy, a third or a fourth or a fifth person was shot. You've got somebody who is very unstable committing these murders, and you've got officers who are acting under time pressures, and they still went and got a warrant rather than just arresting on the spot. And that's just got to be different from situations with warrants where people have a good deal of time to assemble the evidence. But it seems to me that in the case of an emergency, you can go with what you have. And then when you believe that more time is afforded you, you can run down the exculpatory information and the alibi information and the like. And that's what this officer did. He went with what he had when faced with an enormous crime and intense time pressures, and then he didn't just abandon the thing and say, oh, we got the right guy. He then looked for exculpatory evidence, and he checked out the alibi, and eventually when the DNA came in, he and the prosecutor pressed for Mr. Jackson's release. And it's warrants that, I mean, affidavits that satisfy, that might satisfy probable cause when faced with emergencies and exigencies. And the Fourth Amendment has always recognized exigent circumstances as part of the calculus of reasonableness. And that has to be, I would think that has to be the case. And if the, you just don't have time to write a detailed affidavit. And I keep thinking of that, the possibility that hesitancy would have allowed the shooter to kill someone else. That's what's, that's what is bothering me. Yep, and I completely agree. And I think throughout the depositions of the various police officers throughout the case, they kept coming back to the fact that it was a public safety issue, and they were trying to apprehend the suspect as quickly as possible. And then they did continue their investigations. And I think it's also important to note that right after the arrest warrant is completed and the suspect is arrested, then the case is really in the prosecutor's hands at that point. And Detective Karen continued to investigate and was updating the prosecutor. I think if this were a shoplifting situation or something, I would have expected a whole lot more. And I would, of all the questions that my good colleague raises, there's certainly good ones. And I would think that if this were a shoplifting situation, yes, it would be definitely advisable to talk with Mr. Lozano to find out the basis, what his prior experience with Mr. Jackson had been. But I do recognize, I think, a difference between shoplifting, for example, and murder. I would have expected much more in the former and would accord some latitude in the latter. You know, both of them are reasonable, and this bottoms out, I think, on those kinds of facts. You see what I'm saying? No, I agree, and I do understand. Did the district court also rely on immunity? They did, and I just wanted to touch briefly on that. We all know that immunity accommodates the notion that officers can, from time to time, make mistakes and have mistaken identities and allows a constitutional claim or damages claim against the officer only if there's a deliberateness in the violation of the Constitution. He has to know that he was violating the law at the time, and there doesn't seem to be much evidence or any evidence of that here. That's correct, and so the doctrine of qualified immunity would protect the police officer from claims of constitutional violations that arise from reasonable mistake as the legality of their action, and there's no evidence that he had any. To the contrary, he acted somewhat cautiously seeking the advice of his supervisor and of an attorney and a magistrate. So he laid that out and proceeded. This is all in the context of investigating a double murder. We expect officers to make their best efforts, and it looked like he was trying to make his best efforts to get an arrest early. You would agree, though, that the district court found that the testimony, that the information that he provided regarding Hyson was not reliable. There's this dispute where Hyson says, no, I didn't call you back and tell you that, and Karen says, oh, I believe you did. You sent me the pictures. You would agree that that's the whole purpose of the district court carving out that testimony as not being reliable. I do agree. I agree because the district court granted summary judgment, and I think that was a material dispute of fact, but they also went out of their way to take out the portion about Hyson. Because it was a misstatement, right? Well, I don't know if it was necessarily a misstatement. It's just Officer Karen, I think there was an issue about whether or not Hyson was at a basketball game when he got the picture or where he was, and then Karen said that he had called him and told him that he had identified him. And Hyson said, no, I didn't. I don't know if he said he didn't or he said he didn't recall. After the fact, he said the first time that I identified him was two days later when I was in, I guess, the station. That's the first time that I identified him. Well, if you look at the text messages, so Karen sends the picture of the suspect, and then Hyson responds that he looks familiar, and then Karen asks him to look through your books and stuff, and then Hyson sends back the picture of Jackson. And his mother. So that seems to be him saying, I've looked through and here's who it is. So now we're inferring that this is what he said. But either way, you're correct. There's an inference, and that's why the district court carved out the testimony of Hyson. Right, and they found that there was still probable cause for the warrant based solely on Lozano. So in conclusion, the position of the appellee is that, first of all, there was probable cause for the arrest warrant, and second of all, even if there hadn't been, his actions were reasonable and he would be entitled to qualified immunity, and all of the state claims would be dismissed as part of the federal claims. All right, hold on for just one second. Judge, would you like, I want to make sure you have a chance to ask all your questions. Okay. All right, thank you very much. Mr. Norman, we'd be pleased to hear from you in rebuttal. Thank you, Your Honor. I want to make one point right off the bat. The email sent by Lozano to Karen was sent after Mr. Jackson was arrested. I'm not sure the court realizes that. There was no communication. That email was sent about 12 hours after the arrest. So that's something here. The other point I want to make is the biggest error here is that the court never looked at the video to determine whether you could determine probable cause from the video alone. Now, Karen was in a better position than Lozano or Heisen to determine whether there was probable cause to arrest Jackson, whether there could be an ID. He had the whole surveillance video, not just one snippet, and he had pictures of Jackson. All right? And he said it was a match. He said it was a match. He's run away from that. But the reasonable, natural reading is you don't need Heisen, you don't need Lozano. If it's a match, it's a match. The problem is the court didn't look at the surveillance video to say, hey, is this even possible? And because of that, what they should have done, and this court went on in the Robinson case, and this is for qualified immunity. The court needs to say, would a reasonable, prudent officer, not the individual officer subjectively, wouldn't a reasonable, prudent officer find probable cause and be able to make that identification from that piece of evidence? And the problem here is this district court didn't do it. They didn't look at the video. We're not just talking about that officer. We're talking about the supervisor with which he cleared the information. But it does seem to me that there's, of course, judicial review of Fourth Amendment claims invariably involves hindsight because we're looking back at something that happened. But there are times when I think hindsight becomes especially treacherous because you just have to sort of imagine yourself in the shoes, in the situation where someone arrives at a shopping center, finds that two murders have been committed, interviews eyewitnesses, learns that the suspect is still at large, gets a positive email. He didn't get that email. That came after. And again, doesn't make an arrest on the spot, but seeks to get the warrant. That's what we want people to do. I think it's easy enough. Would you let me finish? Yes, Your Honor, I would. I'm just running out of time. I apologize. I came a long way to argue this case. You go ahead then. Excuse me, Your Honor? You go ahead. Thank you, Your Honor. I apologize. I just came a long way to argue this. It's very important. That's all right. I understand that you feel strongly about your case. Thank you. That's just fine. All I'm saying is that it's hard to put yourself back in a situation where someone arrives at a shopping center and finds out something has been. Many officers would have arrested the individual on the spot. They wouldn't have even bothered to get a warrant. They would have just said, okay, I've got this positive e-mail, and I've got this identification from the e-mail. I've got probable cause. But this person, this officer, went the extra step and sought the warrant, and it seems difficult to hold police officers liable when the Supreme Court has made the point often that we want them to go through the warrant process and not look for ways to evade it. Yes, Your Honor. Now, this court in Robinson says that the court must look at the video and determine whether a reasonable officer could use the video to make an identification. That's in the Robinson case. A better case is the Ricks case from New Mexico with a very similar circumstance where the court must make that threshold determination to see if there's evidentiary value where there could be an identification from that video or else all the other context has to come in. It makes sense. If you can make an ID and the court says, yeah, you can do that, then that's all you need. But if the court determines you can't make an ID, then you've got to look at everything else. Here there were eyewitnesses that weren't spoken to. Jackson wasn't interviewed. He didn't talk to Lozano. There's so many factors that wouldn't take long to go ahead and make him realize, hey, I don't have probable cause here. And he could have looked at the video and said, there's no way we can make this ID. We need more. It's just a surveillance video with a black man in a hoodie. That's all it shows. Isn't this a question of would have, could have, should have? No, Your Honor. It's a question. Sorry. We're just not faced with the actuality. There's so much difference between massaging one of these cases in an appellate courtroom and being an officer on the scene of a shooting. There's just, there's all the difference in the world. And the reality of an appellate argument is oftentimes not the reality that an officer is confronting in a shopping center on the street in the immediate aftermath of two killings. That's what I'm saying. It's the two different forms of reality. And you have to be careful not to let one supplant the other. Yes, Your Honor. Your Honor, you still have to find probable cause. You want to make one final statement? You're over your... Yes, Your Honor. If I may, please. You're over your time, but I've cut you off. You've cut me off. I apologize, Your Honor. You're a good guy, and I want you to make a final statement. Your Honor, please. I invite the court, I plead with the court to look at Robinson from this circuit, and also look at the Ricks case. And it shows you that the court has to, they have to make a threshold determination and review the evidence, which is the surveillance video. And they just didn't do it. That's where the error occurred. Because that's the only way they can know whether it was reasonable for an officer to make an ID is if the court knew what the officer looked at. And in this case, the court just didn't do it. Thank you, Your Honors. I really appreciate it. It's an honor to be here. Practiced a long time. I've never been here, so. Well, we want to thank you. We appreciate it, and we appreciate both of your arguments and the thorough way in which you prepared the case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, DeAndrea Gist Benjamin